UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No.:  1:24-cr-10081-ADB

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| v. | ) |
|  | ) |
| JUSTIN CHAPPELL | ) |
|     Defendant | ) |
|  | ) |

## DEFENDANT'S SENTENCING MEMORANDUM

Now comes the defendant, Justin Chappell, by and through the undersigned counsel

pursuant to 18 U.S.C. §3553(a) and the United States Sentencing Guidelines, and hereby moves

this court to depart from the applicable guideline range as calculated by probation, and to impose

a 100 hours of community service sentence of probation on the defendant as is being sought by

the government.  While such a sentence is outside of the advisory guideline range as calculated

by the Probation Department, this sentence is as that recommended by the government, and

strong grounds exist in this case that warrant a term of supervised release/probation and 100

hours of community service for the forty-four year old defendant who undeniably suffers from

post-traumatic stress disorder as a result of his service in the United States Army, during which

he served two tours of duty in Afghanistan and was involved in two-hundred firefights, had

multiple explosions of grenades within 100 meters of himself, and was exposed to death, dying,

and human remains.  PSR ¶¶77-81.  The defendant is married and the father of a ten-year old

daughter to whom he is a "fantastic" father.  PSR ¶¶67-69.  Although the facts in this case are

highly distasteful, probation and lengthy community service is a fair and just sentence when

considering the defendant's background, his acceptance of responsibility and contrition, and the consequences he has already suffered and will continue to suffer.

<u>DEFENDANT'S BACKGROUND</u>

The defendant was born in November of 1979, and spent much of his childhood growing up in Braintree, MA.  His parents divorced when he was 13, after which he moved with his father to Bridgewater, graduating from Bridgwater-Raynham High School in 1997. PSR ¶¶57-59. After high school, he took a few college courses, worked odd jobs at Bradlees and Strawberries, and then in his twenties began working as a security officer as Shreve, Crump & Low in Chestnut Hill. At the age of twenty-five, he enlisted in the United States Army.

The defendant began his military career at Fort Benning, Georgia where he underwent Basic Training and Infantry Training, graduating from Basic Training on Veteran's Day, November 11, 2005.  PSR ¶88.  On November 19, 2005, he married his wife, Kristen, before moving to Fort Drum, New York, where he was assigned as an Infantryman to the 10th Mountain Division.  PSR ¶¶67, 88.  The defendant and his wife remained married to this date, and they share a ten-year old daughter. PSR ¶10.  After spending several months at Fort Drum, the defendant deployed to the Nuristan and Kunar Provinces of Afghanistan, a particularly volatile and violent region of the country.  A Google search of this area in that timeframe would advise anyone how horrifically violent the fighting against the Taliban was during this deployment. This location is where the movie <u>Lone Survivor</u> was set, detailing the true story of a June 28, 2005 ambush of Navy Seals in the Kunar Province who were spotted by local shepherds, who then informed approximately 140 Taliban fighters who surrounded the Seals.  In this attack, the Taliban shot down a helicopter carrying a rescue team, killing 16 soldiers. The defendant's unit

2

was located in this immediate vicinity.  The defendant returned from this first deployment in July

2007, returning to Fort Drum for a one-year training cycle.  See, generally PSR ¶88.

The defendant left in 2009 for his second deployment to the Charkh and Logar Districts

of Afghanistan where he served his second tour in a much more urban setting.  During this

deployment, the defendant was awarded the two attached Department of the Army

"Commendation Medal" Reports on July 28, 2009 and August 4, 2009.[1]  The July 28, 2009

award contains summaries of various combat engagements that the defendant, then serving as a

Sergeant, was involved in on March 24, 2009, May 3, 2009, and May 12, 2009.  In the May 12,

2009 combat incident, the defendant assisted a fellow soldier who had sustained a shrapnel

injury to his shoulder.  In the August 4, 2009 commendation and report, there is lengthy narrative

discussing a lengthy firefight that the defendant was engaged in on April 27, 2009.  The

defendant's deployment ended in January of 2010 and he retired from the Army on March 30,

2010.  See, generally, PSR ¶88.   The defendant received mostly ratings of "Excellence" and was

rated "Among the Best" of his peers.  See attached NCO Evaluation Report.[2]  Per paragraph 80

of the Presentence Investigation Report, "Records from the VA indicate that the defendant was

exposed to the following:  200 firefights; 10 blasts (hand grenades, RPGs or rockets) within 100

meters' burn pits; gas/fuel fumes; death or dying; and human remains."  He also responded yes

to the question "ever thought you were in danger of dying?"  PSR ¶80

In an August 20, 2010 letter from the Department of Veteran's Affairs following the

defendant's exit from the Army, he was rated at this time with a 30% disability for Post

Traumatic Stress Disorder which involved frequent sleeping issues.  (He now was an 80%

---

[1] These two Army Commendation Medal Awards are attached as Ex. 1.
[2] The NCO Evaluation Report is attached as Ex. 2

disability rating for PTSD and is receiving 100% disability from the government.)  During 2010 he met regularly with a licensed Social Worker named Sofia P. Reddy at the Center for Returning Veterans who wrote a December 10, 2010 letter to assist the defendant with noise complaints he was having at the apartment complex he was living.[3]  This letter notes that due to the nature of having served in a warzone it was triggering to be exposed to loud, abrupt and intrusive noises.  See attached December 10, 2010 letter from Sophia Reddy.  It is clear that the defendant's post-traumatic stress disorder is legitimate and is not now being contrived to help him out of a bad situation.

Due to the difficulty the defendant was having adapting to civilian life, in 2011 he took a position as a civilian security contractor working for the State Department in the Basrah area in Iraq.  In his capacity as a contractor, the defendant was engaged in armed security, which included transporting dignitaries and officials from the State Department, the CIA, and other government entities in this area.  He did not experience direct combat during his time as a contractor, although he was subjected to an area with random mortar attacks and IEDs along the roadways.  See generally, PSR ¶94.  These experiences also contributed to his Post Traumatic Stress Disorder. PSR ¶94.  On his return from his armed security contracting position in Iraq in 2015, the defendant took a Civil Service Exam and was hired by the Weymouth Police Department.  He attended the Reading Police Academy in 2015 and then began as a Patrol Officer working a midnight shift with the Weymouth Police. See generally, PSR ¶93.

As noted in the attached letter of support from Stephen Goslin,[4] Justin came into his police career at age 35, and was older than most of the rookie officers that he worked with.

_____

[3] See Ex. 3, letter of Sophia P. Reddy, LICSW.
[4] All letters of support are attached as Ex. 4.

"Based on his age and experience he was an immediate asset to the police department as well as our shift.  Justin was commendable in the handling of all aspects of the job.  He was also helpful in working with the younger officers."  During the time (now) retired Officer Goslin worked with the defendant, they became friends and Goslin was able to observe that "Justin (was) a proud father and husband to his wife Kristen and 10-year-old daughter."  Stephen Goslin continued in writing that the "incident involving Justin, while unfortunate, does not encapsulate him as a person.  He was a tremendous police officer.  He was and still is respected by his peers and the community alike.  His departure from the department was a loss in many ways."

The defendant worked the midnight shift along with Officer Michael Chesna, during which time they became good friends.  They both shared a military background as they both served as Infantrymen in the 10th Mountain Division out of Fort Drum, New York.  Officer Chesna served in Iraq during the time the defendant served in Afghanistan.  This shared experience created a bond between them.  The Weymouth Police Department midnight shift had approximately ten to twelve officers assigned to this shift, with an average of five to six working per night.  Officer Chesna was assigned to a midnight "traffic" car and was active in stopping multiple motor vehicles, many of which were backed up by Officer Chappell.  They would often pull their cruisers alongside each other at night and talk during their shifts.  Officer Chappell was not working on July 15, 2018, the night when Officer Chesna was killed, but was a pallbearer at his funeral.[5]  The undersigned counsel does not seek to excuse the defendant's conduct based on the violent death of a co-worker, although it is understandable human nature that following the

---

[5] As the court is likely aware, Officer Chesna, (posthumously promoted to the rank of Sergeant following his death), was struck in the head with a large stone and then was relieved of his firearm by a subject who then shot Chesna in the head, killing him.  On February 16, 2024, a jury convicted Emanuel Lopes of first-degree murder for killing Sgt. Chesna.

murder of Officer Chesna at the hands of an individual who had incapacitated Chesna with a rock and then shot him with his own firearm, that the defendant, as well as other Weymouth Officers, began to approach minor radio calls with a sense of hypervigilance that they may not have felt before the murder of Officer Chesna.

In 2019, the defendant experienced suicidal ideation and, with the assistance of another law enforcement officer, entered into the in-patient LEADER Program at McLean Hospital. PSR ¶¶81-82.  As will be discussed below, he then commenced a course of counseling and therapy with Charles Lemieux, M.Ed., LMHC, with whom he still devotedly treats today.

<u>THE OFFENSE</u>

The defendant cannot and does not contest the allegations related to the offense as set forth in paragraphs eight through twenty-four of the Presentence Investigation Report, nor does he contest the outline of his police training as set forth in paragraphs twenty-seven through thirty-one of the Presentence Investigation Report.  The defendant clearly snapped from a mental standpoint, grossly overreacted, and used unnecessary and unreasonable force on Mr. McAdam on July 2, 2022, and his behavior cannot be justified.  The defendant acknowledged to his supervisor that night that he had punched Mr. McAdam in the head, PSR ¶19, he acknowledged in his written report that he had applied four to five distraction techniques with a closed fist to Mr. McAdam's head, PSR ¶22, and he accepted responsibility for his actions and resigned nine days after this incident and before his termination hearing.  PSR ¶23.  The defendant later reached out to the Captain who conducted the Internal Affairs Investigation and apologized to him for putting the Department at risk, adding that he "never should have been a cop." PSR ¶¶23-24.  Upon receipt of a target letter in this matter, the defendant promptly agreed to plead

guilty to a felony charge.  The defendant has never run from accepting responsibility for his deeply regrettable actions in this incident

The defendant acknowledges that the videos of the incident are extremely difficult to watch, and is deeply regretful of his actions that night.  It paints not only a bad picture of the defendant, but it casts all of law enforcement in a bad light.  The defendant's conduct may have been brief, but it still serves to breach the trust between citizens and law enforcement.  It is worth noting, however, that Mr. McAdam did refuse medical treatment at the scene from EMTs who had been called, and his only complaint of injury that night was to his right calf area where he had been struck with a baton.  PSR ¶18.  Nevertheless, the defendant accepts responsibility for his conduct, and regrets putting his co-workers and the Weymouth Police Department at risk due to his inability to maintain composure when dealing with Mr. McAdam.

Following his resignation from the Weymouth Police Department, the defendant worked briefly for an elevator company where he obtained employment through a friend.  After his brief stint with the elevator company, the defendant entered a vocation rehabilitation program through the Veteran's Administration, and decided to seek an Associate's Degree in Psychology at Quincy College.  The defendant's career objectives are to assist veteran's and first responders dealing with mental health issues so they do not end up in a situation similar to that the defendant finds himself in.  The defendant had experienced a mental health situation in 2019 that had resulted in him spending two weeks in the LEADER Program at McLean Hospital, after which

the defendant had engages in a course of counseling with an out-patient therapist name Charles Lemieux, M.Ed., LMHC, the defendant continues to meet with regularly.[6]

Having experienced mental health treatment himself, and being 100% disabled now through the VA due to post traumatic stress disorder, the defendant was keenly aware of the issues facing veterans and first responders, and wants to dedicate his life to helping them. He is currently finishing his Associate's Degree in Psychology at Quincy College, and plans on enrolling in their Bachelor's Program in the fall of 2024. Thereafter, he would like to obtain an internship working in the field of mental health, and eventually obtain a Master's Degree in this field.

## SENTENCING FRAMEWORK

As the court is well aware, in *United States* v. *Booker*, 543 U.S. 220, 226-227, 125 S.Ct. 738 (2005), the Supreme Court held that the mandatory Sentencing Guidelines system violated the Sixth Amendment, and thus as a remedial measure the guidelines remain "effectively advisory."  Although the sentencing commissions "recommendation of a sentencing range will 'reflect a rough approximation of the sentence that might achieve §3553(a)'s objective,' *Rita* v. *United States*, 551 U.S. 338, 350, 127 S.Ct. 2456, 2465 (2007)," *Kimbrough* v. *United States*, 552 U.S. 85, 89, 128 S.Ct. 558, 562-563 (2007), the guidelines are treated as only the "starting point and the initial benchmark" for calculating the appropriate sentence.  *Gall* v. *United States*, 552 U.S. 38, 49, 128 S.Ct. 586 (2007), *Rita* v. *United States*, 551 U.S. at 347, 350, 127 S.Ct. 2464-2465 (2007).  "The guidelines are not the only consideration, however.  Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the

---

[6] Upon the allowance of Defendant's Motion to Seal that is being filed herewith pursuant to Local Rule 7.2 and 83.6.11(b)(4), a letter written by Charles Lemieux, M.Ed., LMHC, outlining his involvement and counseling with the defendant will be filed under seal.

district court judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, <u>he may not presume that the Guidelines range is reasonable</u> [citation omitted].  He must make an individualized assessment based upon the facts presented."  *Gall* v. *United States*, 552 U.S. 28, 49-50, 128 S.Ct. 586, 596-597 (2007).

"In the course of [the sentencing] assessment, the court would have to ask whether such a sentence, if imposed, would encourage 'respect for the law,' 18 U.S.C. §3553(a)(2)(A); 'provide just punishment for the offense,' *id*.; and 'afford adequate,' but not excessive, deterrents, *id*. §3553(a)(2)(B).  Ultimately, the court (depending on how it views the case) could ground a variant sentence in the parsimony principle rather than in §3553(a)(6) alone."  *United States* v. *Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008), citing *Kimbrough* v. *United States*, 552 U.S. 111, 128 S.Ct. at 575.  In crafting such a sentence, the court must remain vigilant and mindful that §3553(a)'s over arching instruction is to "impose a sentence sufficient, <u>but not greater than necessary</u>," to accomplish the sentencing goals advanced in §3553(a)(2).

As the court is mindful, the second factor required under §3553(a) requires consideration of the following:

"the need for the sentence imposed -

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  §3553(a)(2)."

<u>SENTENCING RECOMMENDATION</u>

Looking at the defendant, his background, the punishment he has already received, the devastating effect any period of incarceration would have on the defendant's immediate and extended family, the fact the defendant poses no risk of re-offending, and the fact that he is no danger to society, a sentence of probation and significant community service is considerably more than necessary to meet the purposes of §3553(a) and abides by its directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing described in the second factor.  See *Gall* v. *United States*, supra at 50, 128 S.Ct. at 597.

Here, the defendant is not in a position to re-offend or to abuse the position of authority as he has resigned as a police officer and will never work in law enforcement again.  The defendant is keenly aware that as a result of his post-traumatic stress disorder, he was at high risk of over-reacting in a situation that required self-defense or that placed him in fear of serious injury, and has completely removed himself from those potential situations through his resignation.   The defendant's law enforcement credentials were "decertified" by the Massachusetts POST Commission, and regardless, as a convicted felon he can never own a firearm or work in law enforcement again.

The defendant also contends that although probation/supervised release and community service may be viewed by some as a light punishment, here, the defendant has lost a career he enjoyed, has to an extent lost his ability to provide for his family, and is now a convicted felon with limited job opportunities as a result of that conviction.  Those factors themselves should be viewed as adequate deterrence for others.

The defendant is also not in need of court supervision, as the defendant is deeply committed to maintaining his mental health treatment for the sake of himself and his family.  The

10

defendant did not seek out mental health treatment because he was required to do it, but rather has been compliant with his mental health treatment because he knows that it is necessary for his well-being.  Although the defendant is certainly willing to be compliant with any court obligation to maintain mental health treatment and to provide any documentation to the court through the probation department regardless of any court obligation to maintain said mental health treatment, the defendant will pursue it on his own.  The defendant has been closely working with both Charles Lemieux and with his case manager at the Veteran's Administration, and is deeply driven now to pursue his new career goal of helping others.

Despite his post-traumatic stress disorder, the defendant has always been deeply committed to his family.  As noted in the attached letter of Kimberly O'Connor who has known the defendant for over twenty-five years, the defendant "has always displayed good moral character, a commitment to his family and a willingness to help others."  He is "a caring son, brother, and uncle."  As the father of a ten-year old daughter, any sentence of incarceration would be deeply disruptive and emotionally damaging to the defendant's daughter as well as the defendant's wife.  As noted in the attached letter from Karen Lamie, an individual who has known the defendant since his teenage years, the defendant "is such a wonderful Dad to his daughter [--], and he takes very good care of his family.  In all my years knowing Justin I have never seen an angry attitude or any violence from him."  As noted in the attached letter from Patricia Gannon, RN, MS, CPN, CNRN, who is the defendant's aunt through marriage, she has had the opportunity to observe the defendant for the past twenty years, and notes that "Justin has been a wonderful father to my great-niece [---], age 10 years, and husband to my niece Kristen (his wife)."  Ms. Gannon notes that "Justin steps in to help his disabled mother, and assure her

11

safety with kindness and compassion.  As a caretaker for his daughter [---], he is present and caring.  As a pediatric clinician, it has been my experience that the best outcome for children is to have both parents in the home and present in their life."

Given the facts and circumstances  of the offense, the defendant's prompt acceptance of responsibility, the defendant's service to the country through two deployments to Afghanistan where he was engaged in multiple acts of combat resulting in post-traumatic stress disorder, the consequences the defendant has already endured as a result of his actions, and the disruption of any period of incarceration would cause to his family life - - particularly to his ten-year old daughter - - as well as his efforts to rehabilitate himself through education, the defendant asks the court to accept the government's proposed sentence.

<u>CONCLUSION</u>

For all the foregoing reasons, as well as the additional grounds set forth in letters of support, the defendant moves that this court show leniency and to impose a sentence of supervised release/probation and community service as sought by the government.

Respectfully submitted,
Defendant,
JUSTIN CHAPPELL,
By his Attorney,

*/s/ Kenneth H. Anderson, Esq.*
Kenneth H. Anderson, Esq.
B.B.O. # 556844
ANDERSON, GOLDMAN, TOBIN,
 & PASCIUCCO, L.L.P.
50 Redfield Street
Boston, MA  02122
(617) 265-3900
kanderson@andersongoldman.com

DATED:  July 11, 2024

### CERTIFICATE OF SERVICE

I, Kenneth H. Anderson, Esq., attorney for the defendant hereby certify that I served **DEFENDANT'S SENTENCING MEMORANDUM,** filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on July 11, 2024.


*/s/ Kenneth H. Anderson, Esq.*
Kenneth H. Anderson, Esq.
